11793

# Rules and Regulations

Federal Register

Vol. 90, No. 47

Wednesday, March 12, 2025

GOVERNMENT EXHIBIT

D

---

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

---

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 264**

[CIS No. 2810–25; DHS Docket No. USCIS–2025–0004]

RIN 1615–AC96

### Alien Registration Form and Evidence of Registration

**AGENCY:** U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS").

**ACTION:** Interim final rule ("IFR") with request for comments.

**SUMMARY:** This IFR amends DHS regulations to designate a new registration form for aliens to comply with statutory alien registration and fingerprinting provisions. Aliens who are subject to alien registration requirements of the Immigration and Nationality Act, as amended ("INA") who have not yet registered may use this registration form to satisfy their statutory obligations. This IFR also amends DHS regulations to designate additional documentation that may serve as evidence of alien registration.

**DATES:**
*Effective date:* This IFR is effective April 11, 2025.
*Registration:* Aliens may register using the revised form G–325R, Biographic Information (Registration) immediately.
*IFR comment period:* Comments on the rule must be received by April 11, 2025.
*Information collection comment period:* Comments on the information collection described in the *Paperwork Reduction Act* section below must be received by May 12, 2025.

**ADDRESSES:**
*Comments on the IFR:* You may submit comments on this IFR, identified by DHS Docket No. USCIS–2025–0004, through the Federal eRulemaking Portal at *https://www.regulations.gov*. Follow the website instructions for submitting comments.

*Comments on the Information Collection:* Submit comments on the information collection to the same docket as the IFR. In addition, all comments on the information collection must include the OMB Control Number 1615—NEW in the body of the comments.

Comments submitted in a manner other than the ones listed above, including emails or letters sent to the Department's officials, will not be considered comments on the proposed rule and may not receive a response from the Department. Please note that the Department cannot accept any comments that are hand-delivered or couriered. In addition, the Department cannot accept comments contained on any form of digital media storage devices, such as CDs, DVDs, or USB drives. The Department is not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov*, please contact Jerry Rigdon, Acting Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**
Mark Phillips, Residence and Naturalization Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Instructions for providing comments are in the **ADDRESSES** caption above.

*Privacy:* You may wish to consider limiting the amount of personal information that you provide in any public comment submission you make to the Department. The Department may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov*.

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov*. DHS Docket No. USCIS–2025–0004. You may also sign up for email alerts on the online docket to be notified when comments are posted or when the final rule is published.

## II. Background

### A. Alien Registration Requirements of the INA

The Alien Registration Act of 1940, also known as the Smith Act, was enacted into law on June 28, 1940. *See* Public Law 76–670, 54 Stat. 670. The Act generally required all aliens in the country beyond 30 days to apply to register and to be fingerprinted. Congress later incorporated these requirements, as amended, in the Immigration and Nationality Act of 1952, Public Law 82–414, 66 Stat. 163. The registration and fingerprinting requirements currently appear, as amended, in part VII of subchapter II of chapter 12 of title 8, United States Code (8 U.S.C. 1301–1306). Throughout this preamble, we refer to such requirements as the alien registration requirements, or the alien registration requirements of the INA.

Under the alien registration requirements of the INA, with limited exceptions (*e.g.*, for visa holders who have already been registered and fingerprinted (through their application for a visa) and A and G visa holders, *see* 8 U.S.C. 1201(b)), all aliens above the age of 14 who remain in the United States for 30 days or longer must apply for registration and to be fingerprinted before the expiration of 30 days. *See* 8 U.S.C. 1302(a). Similarly, parents and legal guardians must ensure that their children below the age of 14 are registered. Within 30 days of reaching his or her 14th birthday, the alien child must "apply in person for registration and to be fingerprinted." 8 U.S.C. 1302(b). The Secretary of Homeland Security ("Secretary") may, in her discretion and on the basis of reciprocity pursuant to such regulations as she may prescribe, waive the requirement of fingerprinting specified in 8 U.S.C. 1302(a) and (b) in the case of any nonimmigrant. 8 U.S.C. 1302(c). As discussed in the next section, the Secretary has exercised this authority with respect to certain nonimmigrants.

An alien's willful failure or refusal to apply to register or to be fingerprinted is punishable by a fine of up to $5,000 or imprisonment for up to six months, or both. 8 U.S.C. 1306(a).[1] The same applies to an alien's parent or legal guardian's willful failure or refusal to register. *Id.* Any alien or any parent or legal guardian of an alien who files a registration application "containing statements known by him to be false, or who procures or attempts to procure registration of himself or through another person by fraud" is subject to criminal prosecution. 8 U.S.C. 1306(c); *see, e.g.,* 18 U.S.C. 1001, 1546. A conviction for fraudulent registration constitutes a ground of deportability under 8 U.S.C. 1227(a)(3)(B)(i).

The Secretary has authority to "prepare forms for the registration and fingerprinting of aliens," which "shall contain inquiries with respect to (1) the date and place of entry of the alien into the United States; (2) activities in which he has been and intends to be engaged; (3) the length of time he expects to remain in the United States; (4) the police and criminal record, if any, of such alien; and (5) such additional matters as may be prescribed." 8 U.S.C. 1304(a). The Secretary also has authority to prescribe "special regulations and forms for the registration and fingerprinting of" certain classes of aliens, including "aliens of any other class not lawfully admitted to the United States for permanent residence," "[n]otwithstanding the provisions of" 8 U.S.C. 1301 and 1302. 8 U.S.C. 1303(a). Although this rule is fully consistent with 8 U.S.C. 1301 and 1302 and related authority, the Secretary also invokes 8 U.S.C. 1303(a) to the extent necessary to support this rulemaking.

Every alien in the United States who has been registered and fingerprinted under the alien registration requirements of the INA must "be issued a certificate of alien registration or an alien registration receipt card in such form and manner and at such time as shall be prescribed under regulations issued by the [Secretary]." 8 U.S.C. 1304(d).[2] Every registered alien 18 years

of age and over must at all times carry and have in their personal possession any certificate of alien registration or alien registration receipt card. Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1304(e); 18 U.S.C. 3559(a)(8), 3571(b)(6).

Finally, each alien required to be registered under the alien registration requirements of the INA who is within the United States must notify DHS in writing of each change of address and new address within ten days from the date of such change and provide such additional information as the Secretary may require by regulation. 8 U.S.C. 1305(a). Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1306(b); 18 U.S.C. 3559(a)(8), 3571(b)(6). In addition, any alien who has failed to comply with the change-of-address notification requirements of 8 U.S.C. 1305 is deportable unless the alien establishes that such failure was reasonably excusable or was not willful. *See* 8 U.S.C. 1227(a)(3)(A).

*B. Current Regulations*

Longstanding regulations provide that within 30 days after reaching the age of 14, any alien in the United States who is not exempt from alien registration must apply for registration and fingerprinting, unless fingerprinting is waived under 8 CFR 264.1(e) (which waives fingerprinting for certain nonimmigrants[3]), in accordance with applicable form instructions. 8 CFR 264.1(g).

If such alien is a lawful permanent resident of the United States and is temporarily absent from the United States when he reaches the age of 14, the alien must apply for registration and provide a photograph within 30 days of his or her return to the United States in accordance with applicable form

instructions. 8 CFR 264.1(g)(1). The alien, if a lawful permanent resident of the United States, must surrender any prior evidence of alien registration. *Id.* USCIS will issue the alien new evidence of alien registration. *Id.* In the case of an alien who is not a lawful permanent resident, the alien's previously issued registration document will be noted to show that he or she has been registered and the date of registration. 8 CFR 264.1(g)(2).

DHS has by regulation prescribed forms that satisfy registration requirements. *See* 8 CFR 264.1(a). The regulations also designate certain forms as constituting evidence of registration. 8 CFR 264.1(b).

DHS regulations identify the following forms as registration forms:
• I–67, Inspection Record—Hungarian refugees (Act of July 25, 1958).
• I–94, Arrival-Departure Record—Aliens admitted as nonimmigrants;[4] aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act; aliens whose claimed entry prior to July 1, 1924, cannot be verified, they having satisfactorily established residence in the United States since prior to July 1, 1924; aliens lawfully admitted to the United States for permanent residence who have not been registered previously; aliens who are granted permission to depart without the institution of deportation proceedings or against whom deportation proceedings are being instituted.
• I–95, Crewmen's Landing Permit—Crewmen arriving by vessel or aircraft.
• I–181, Memorandum of Creation of Record of Lawful Permanent Residence—Aliens presumed to be lawfully admitted to the United States under 8 CFR 101.1.
• I–485, Application for Status as Permanent Resident—Applicants under sections 245 and 249 of the Immigration and Nationality Act as amended, and section 13 of the Act of September 11, 1957.
• I–590, Registration for Classification as Refugee—Escapee—Refugee-escapees paroled pursuant to section 1 of the Act of July 14, 1960.
• I–687, Application for Status as a Temporary Resident—Applicants under section 245A of the Immigration and Nationality Act, as amended.
• I–691, Notice of Approval for Status as a Temporary Resident—Aliens adjusted to lawful temporary residence under 8 CFR 210.2 and 245A.2.

[1] Section 1306(a) refers to a fine of up to $1,000, but the general fine provisions of 18 U.S.C. 3571 supersede that language. As a class B misdemeanor, the applicable fine is not more than $5,000. *Id.;* 18 U.S.C. 3559(a)(7).

[2] As of March 1, 2003, in accordance with section 1517 of Title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Immigration and Nationality Act describing functions which were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of

Homeland Security. 6 U.S.C. 557 (2003) (codifying HSA, Title XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

[3] The Secretary may waive fingerprinting requirements for some nonimmigrants. Such waivers are in the Secretary's discretion, on the basis of reciprocity, and pursuant to such regulations as the Secretary may prescribe. 8 U.S.C. 1302(c). Applicable regulations waive fingerprinting requirements for some nonimmigrants. *See* 8 CFR 264.1(e)(1) and (2). The waiver covers various diplomatic and similar categories; other nonimmigrant aliens, while they maintain nonimmigrant status, who are nationals of countries which do not require fingerprinting of U.S. citizens temporarily residing therein; and nonimmigrants who depart from the United States within one year of admission. *Id.* A nonimmigrant who fails to maintain status must apply to be fingerprinted at once upon failing to maintain nonimmigrant status. 8 CFR 264.1(e)(3).

[4] This includes aliens admitted as B–1/B–2 nonimmigrants through the Visa Waiver Program who were issued Form I–94W.

• I–698, Application to Adjust Status from Temporary to Permanent Resident—Applicants under section 245A of the Immigration and Nationality Act, as amended.

• I–700, Application for Status as a Temporary Resident—Applicants under section 210 of the Immigration and Nationality Act, as amended.

• I–817, Application for Voluntary Departure under the Family Unity Program.

*See* 8 CFR 264.1(a).

The regulations identify the following forms as constituting evidence of registration:

• I–94, Arrival-Departure Record—Aliens admitted as nonimmigrants; aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act; aliens whose claimed entry prior to July 1, 1924, cannot be verified, they having satisfactorily established residence in the United States since prior to July 1, 1924; and aliens granted permission to depart without the institution of deportation proceedings.

• I–95, Crewmen's Landing Permit—Crewmen arriving by vessel or aircraft.

• I–184, Alien Crewman Landing Permit and Identification Card—Crewmen arriving by vessel.

• I–185, Nonresident Alien Canadian Border Crossing Card—Citizens of Canada or British subjects residing in Canada.

• I–186, Nonresident Alien Mexican Border Crossing Card—Citizens of Mexico residing in Mexico.

• I–221, Order to Show Cause and Notice of Hearing—Aliens against whom deportation proceedings are being instituted.

• I–221S, Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien—Aliens against whom deportation proceedings are being instituted.

• I–551, Permanent Resident Card—Lawful permanent resident of the United States.

• I–766, Employment Authorization Document ("EAD").

• Form I–862, Notice to Appear—Aliens against whom removal proceedings are being instituted.

• Form I–863, Notice of Referral to Immigration Judge—Aliens against whom removal proceedings are being instituted.

*See* 8 CFR 264.1(b). In addition, under a note to section 264.1(b), a valid, unexpired nonimmigrant DHS admission or parole stamp in a foreign passport constitutes evidence of registration.

## III. Basis and Purpose of the IFR

This rule would partially implement section 7 of Executive Order 14159, Protecting the American People Against Invasion (Jan. 20, 2025), 90 FR 8443 (Jan. 29, 2025). Section 7 directs the Secretary, in coordination with the Secretary of State and the Attorney General, to take all appropriate action to:

• Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, U.S. Code (8 U.S.C. 1301–1306);

• Ensure that all previously unregistered aliens in the United States comply with 8 U.S.C. 1301–1306; and

• Ensure that failure to comply with the legal obligations of 8 U.S.C. 1301–1306 is treated as a civil and criminal enforcement priority.

90 FR 8444.

Following issuance of this Executive Order, DHS reviewed the registration regulations at 8 CFR part 264 and determined that it would be appropriate to designate a general registration form in addition to those already identified in the regulations. DHS believes that a general registration option may improve registration outcomes for certain groups of aliens. For instance, under current regulations, in general:

• Aliens who entered without inspection and have not otherwise been encountered by DHS lack a designated registration form.

• Even an alien who entered without inspection and who is later encountered by DHS, such as by applying for (or being granted) asylum or Temporary Protected Status (TPS), would not typically use the registration forms identified in § 264.1(a) when applying for asylum or TPS.[5]

• Many Canadian nonimmigrants for business or pleasure are not issued a Form I–94 even though they have not been registered through the visa process. *See* 8 CFR 212.1(a)(1), 235.1(f)(1)(ii).

• Some forms designated for registration in 8 CFR 264.1(a) (such as the Form I–485) are not normally used within 30 days of entry into the United States (the relevant time period for registration under 8 U.S.C. 1302 and 8 CFR 264.1(g)).

[5] Such aliens may receive an EAD, which is designated as evidence of registration in § 264.1(b), but such aliens frequently are not required to apply for an EAD and may not be entitled to one. In addition, the application for an EAD (Form I–765, Application for Employment Authorization) is not designated as a registration form in § 264.1(a), which could result in confusion.

• In some cases, the acceptable evidence of registration at 8 CFR 264.1(b) is the result of an approved application only, which may leave denied or pending applicants without any acceptable evidence that they have complied with the requirement to register.

• The regulatory registration structure does not use any of the petitions filed on behalf of children or other derivative beneficiaries who may be in the United States.

Consistent with the Executive Order and the alien registration requirements of the INA, this rule designates a general registration option available to all unregistered aliens regardless of their status. To use this option, aliens must create their own unique account, or an account for their child, in myUSCIS at *https://my.uscis.gov/* and then complete G–325R Biographic Information (Registration), which is currently free of charge.

Submission of the registration in myUSCIS initiates the process for the alien's Biometrics Services Appointment at a USCIS Application Support Center (ASC). USCIS contacts the registrant regarding the biometrics services appointment and the collection of biometrics, including fingerprints, photograph and signature. USCIS uses this information for purposes of identity verification, and background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI).[6] USCIS sends an appointment notice with the date, time and location of the registrant's biometric services appointment.

Once an alien successfully completes his or her biometrics appointment at an ASC, the ELIS case management systems will trigger the creation of "Proof of Alien Registration" with a unique identifier printed on the document. For those aliens, such as Canadian nonimmigrants and aliens under the age of 14, required to register but for whom the fingerprint requirement is waived, the ELIS case management system will trigger the creation of the "Proof of Alien Registration" upon receipt of Form G–325R. This Proof of Alien Registration document will then be posted to the alien's myUSCIS account. In the myUSCIS account, the alien will be allowed to download a .PDF version of the document, and can print it. This document serves as evidence of the

[6] *See* 8 CFR 103.16.

alien's registration for purposes of 8 U.S.C. 1304(d).[7]

This IFR fills the gaps in the regulatory regime by prescribing a registration form available to all aliens regardless of their status, in addition to the other forms already listed. Specifically, this IFR lists the new form at 8 CFR 264.1(a) and lists the corresponding evidence of registration at 8 CFR 264.1(b).

Consistent with 8 U.S.C. 1359, DHS interprets the registration and fingerprinting requirements of 8 U.S.C. 1302 to exclude from "all aliens" American Indians born in Canada who possess at least 50 per centum of blood of the American Indian race who are present in the United States under the authority of 8 U.S.C. 1359, as 8 U.S.C. 1302 and other provisions of subchapter II of Chapter 12, title 8 of the U.S. Code are construed consistent with their right to pass the borders of the United States.[8] Therefore, the registration form added in this IFR would not be used by section 1359 entrants because such entrants do not have to register, although they may do so if they wish.

The rule does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the Act. An alien who has previously registered consistent with 8 CFR 264.1(a), or an alien who has evidence of registration consistent with 8 CFR 264.1(b), need not register again, although such an alien is subject to ongoing change of address reporting requirements under 8 U.S.C. 1305(a) and 8 CFR 265.1.

### IV. Request for Comment on Potential Fee

While DHS is not incorporating a fee for filing Form G–325R at this time, DHS welcomes comment on the option of adding a biometric services fee per registrant of $30, for the collection, use, and storage of biometric information, pursuant to 8 CFR 103.16 and 17.

DHS has broad statutory authority to collect biometric information when

such information is necessary or relevant to the administration of the INA, including 8 U.S.C. 1304(a). Pursuant to 8 CFR 103.2(b)(9), 8 CFR 103.16 and 17, DHS may collect, use, and store biometrics for purposes of conducting background and security checks, adjudicating benefits and performing other functions related to administering and enforcing the immigration laws. See 8 CFR 103.2(b)(9). USCIS may require the payment of any biometric services fee identified in 8 CFR 106.2, or also charge a fee that is required by law, regulation, form instructions, or **Federal Register** notice applicable to the request type. See 8 U.S.C. 1356(m); 8 CFR 103.2(b)(9), 103.7, 103.17; 8 CFR part 106.

In previous rules, USCIS has evaluated the cost to USCIS of conducting biometric activities, including FBI Name checks and fingerprints, ASC contractual support, and biometric service management overall, including the cost of federal employees at the ASC locations.[9] USCIS currently pays approximately $10.00 to the FBI for fingerprinting results.[10] As part of USCIS' recent Fee Schedule rule, and for purposes of the creation of a separate biometric fee for certain programs, USCIS calculated that the biometric collection, storage and use at an ASC costs approximately $19.50.[11] The sum of these costs is approximately $29.50, which USCIS rounded up to the nearest $5 increment, similar to other Immigration Examinations Fee Account (IEFA) fees, making the fee $30.[12] Therefore, DHS welcomes comment on whether to cover these costs via a $30 biometric services fee for this population. DHS welcomes comments on this potential fee, including the calculation of the fee.

### V. Statutory and Regulatory Requirements

#### A. Administrative Procedure Act

DHS has issued this IFR without prior notice and opportunity for comment because this is a rule of agency organization, procedure, or practice ("procedural rule"). See 5 U.S.C. 553(b)(A). The procedural-rule exception "covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." JEM Broad. Co., Inc. v. FCC, 22 F.3d 320, 326 (D.C. Cir. 1994) (quoting Batterton v. Marshall, 648 F.2d 694, 707 (D.C. Cir. 1980)); see also Mendoza v. Perez, 754 F.3d 1002, 1023–24 (D.C. Cir. 2014); see also Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1047 (D.C. Cir. 1987) (holding that procedural rules are those that do not "encode a substantive value judgment or put a stamp of approval or disapproval on a given type of behavior").

The IFR merely adds another method (the myUSCIS registration process) for compliance with existing statutory registration requirements. It does not alter the rights or interests of any party, or encode a substantive value judgment on a given type of private behavior. Accordingly, DHS has proceeded without advance notice and opportunity for comment. DHS nonetheless welcomes post-promulgation comment on all aspects of this IFR consistent with the instructions provided in section I of this preamble.

#### B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review), direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. Executive Order 13563 emphasizes the importance of quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. The Office of Management and Budget has determined that this rule is significant under Executive Order 12866 and has reviewed this regulation.

#### Summary

DHS is amending existing regulations to make available another method for aliens to comply with the alien registration requirements of the INA. The rule seeks to better ensure that all

---

[7] As noted above, every registered alien 18 years of age and over must at all times carry and have in their personal possession any certificate of alien registration or alien registration receipt card. Noncompliance is a misdemeanor punishable by a fine of up to $5,000 or imprisonment for not more than thirty days, or both. 8 U.S.C. 1304(e); 18 U.S.C. 3559(a)(8), 3571(b)(6).

[8] See Akins v. Saxbe, 380 F. Supp. 1210 (D. Me. 1974); Matter of Yellowquill, 16 I&N Dec. 576 (BIA 1978). Certain members of the Texas Band of Kickapoo Indians similarly are not required to register. See Texas Band of Kickapoo Act, Public Law 97–429, sec. 4(d) (1983) ("Notwithstanding the Immigration and Nationality Act, 8 U.S.C. 1101, all members of the Band shall be entitled to freely pass and repass the borders of the United States and to live and work in the United States.").

[9] See DHS, U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Immigration Benefit Requests. 88 FR 402, 484–485 (Jan. 4, 2023). DHS finalized the proposed rule and published a final rule in January 2024, with an effective date of April 1, 2024. See 89 FR 6194 (Jan. 31, 2024).

[10] See 88 FR at 485 (Jan. 4, 2023) (reflecting $11.25 for fingerprint-based Centralized Billing Service Provider (CBSP) checks). Since the publication of the NPRM, the Federal Bureau of Investigation (FBI), U.S. Department of Justice, has revised its fee scheduled, effective January 1, 2025, and lowered the fee for CBSPs to $10.00. See 89 FR 68930 (Aug. 28, 2024).

[11] See 88 FR at 485 (addressing the calculation of biometric services fee for purposes of applicants for Temporary Protected Status (TPS) under proposed 106.2(a)(48)(iii), now included at 8 CFR 106.2(a)(50)(iii), and DHS–EOIR biometric services fee under 8 CFR 103.7(a)(2)).

[12] See 88 FR at 485.

aliens in the United States comply with such requirements. The rule does not impose any new registration or fingerprinting obligations separate from the obligations already contained in the INA.

DHS has assessed both the costs and benefits of this rule as required by Executive Orders 12866 and 13563. The rule will result in costs to aliens not currently complying with the requirements of the Act, which include the cost of time to complete and file a registration form as well as time spent submitting biometrics. DHS will incur additional costs due to the added activities from the collection of biometrics given the impacted population of aliens do not pay fees for registration or biometrics. However, the rule also offers benefits by providing a general registration option to allow all unregistered aliens to comply with their registration requirements, which will have direct benefits via improved DHS law enforcement efficacy and indirect benefits as a result of improved enforcement.

Affected Population

The most recent DHS population estimate for aliens without lawful status residing in the United States was 11 million as of January 1, 2022.[13] Most of these aliens either entered the United States without inspection or were admitted temporarily and remained past the date they were required to depart. This population comprises aliens who may have filed one of the forms as discussed in the preamble as designated registration forms under 8 CFR 264.1(a), and may have evidence of registration under 8 CFR 264.1(b).

The population impacted by this rule are those who are currently unregistered and who would use the general registration form designated under this rule. DHS estimates the affected population to be between 2.2 million and 3.2 million, after accounting for groups who have engaged with DHS and have previously filed one of the designated registration forms discussed in the preamble (requirements under 8 CFR 264.1(a) or 8 CFR 264.1(b)).[14] The

affected population includes, for instance:

• Aliens who are present in the United States without inspection and admission or inspection and parole and have not yet registered (i.e., have not yet filed a registration form designated under 8 CFR 264.1(a), and do not have evidence of registration under 8 CFR 264.1(b)).

• Canadian visitors who entered the United States at land ports of entry and were not issued evidence of registration (e.g., Form I–94).

• An alien, whether previously registered or not, who turns 14 years old in the United States and therefore must register within 30 days after their 14th birthday.

DHS recognizes there could be additional aliens subject to this rule in the future. Relying on this estimate may somewhat overstate those who need to fully comply as aliens under 14 years of age are required to be registered but do not need to provide fingerprinting.

Costs

DHS recognizes that there are costs to aliens to comply with registration requirements in the Executive Order and the INA's alien registration provisions. Because this rule does not impose any new alien registration or biometric obligations separate from those already contained in the Act, the costs described in this section are inherent to compliance with the statute and are not a result of this rule. DHS nonetheless assesses the effects of the increased compliance that may result from this rule. DHS similarly assesses the benefits in the following section.

Costs to aliens may include the time to complete and file a registration form, as well as time spent traveling to an ASC, submitting fingerprints, and record retention. There is currently no fee for applicants to file the prescribed form or to submit biometrics, but applicants take on the burden of time to complete the form.[15] While travel times and distances vary, applicants would need to travel to an ASC in order to submit biometrics and spend an additional amount of time to complete the collection.[16] The total filing burden

for new registrations will include the cost of time to submit biometrics and the time burden of registration using the prescribed forms in the regulation.

Additional compliance with registration obligations would also result in more aliens needing to maintain evidence of registration in the mode prescribed by DHS. Aliens may also spend some marginal amount of time to become familiar with the process and specific steps they should take to be compliant.

This IFR has the potential impact of increasing the biometric activities for DHS, such as additional FBI Name checks, fingerprinting, and support from ASC locations, estimated to cost $30 per applicant. The additional costs of the registration activities will be taken on by DHS given the population subject to this IFR currently does not pay fees for registration or biometric services, increasing costs to DHS. Earlier in this preamble, DHS has sought comment on a potential fee.

Benefits

The benefit of this IFR is the designation of a general registration form option that will improve registration outcomes for aliens identified in the Affected Population section above, consistent with the requirements of the alien registration provisions of the INA. This IFR provides a registration form available to all unregistered aliens regardless of their status. This rule fills a gap in registration by adding an online option to comply with existing statutory registration requirements.

The IFR is also expected to improve DHS law enforcement efficacy, because law enforcement personnel would have access to more comprehensive registration data. To the extent that the rule results in DHS receiving more comprehensive information about the location of aliens in the United States, the rule will make it easier and safer for DHS to enforce the law. In addition, increased compliance with fingerprinting requirements would provide DHS with additional information about an alien's criminal record, including whether the alien is a known or suspected terrorist. Such information provides greater situational awareness to law enforcement, including when executing arrest warrants. When DHS has more information about potential targets of

---

[13] See DHS Office of Homeland Security Statistics (OHSS), Estimates of the Unauthorized Population Residing in the United States: January 2018–January 2022 (Apr. 2024), https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf.

[14] Estimate calculated by the Office of Homeland Security Statistics. This estimate does not include aliens who have already met one or more conditions for registration, and accounts for changes to the alien population from 2022 through 2024 as well as emigration and mortality rates.

Other groups already considered registered for purposes of this analysis and not part of the affected population include those who have been issued an I–94 form, were paroled into the United States, were issued an EAD, or were issued a notice to appear in section 240 removal proceedings.

[15] The respondent burden to file Form G–325R is discussed below in the Paperwork Reduction Act section.

[16] See Employment Authorization for Certain H–4 Dependent Spouses, 80 FR 10284 (Feb. 25, 2015); and Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78

FR 536, 572 (Jan. 3, 2013); see also USCIS, DHS, "Instructions for Application to Register Permanent Residence or Adjust Status (Form I–485)," OMB No. 1615–0023 (expires Oct. 31, 2027), https://www.uscis.gov/sites/default/files/document/forms/i-485instr.pdf.

law enforcement, it can make more efficient use of law enforcement resources and better protect public safety and officer safety.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.*, small businesses, small organizations, and small governmental jurisdictions). The RFA's regulatory flexibility analysis requirements apply only to those rules for which an agency is required to publish a general notice of proposed rulemaking pursuant to 5 U.S.C. 553 or any other law. *See* 5 U.S.C. 604(a). DHS did not issue a notice of proposed rulemaking for this action. Therefore, a regulatory flexibility analysis is not required for this action. Nonetheless, DHS has determined that this rule will not have a significant economic impact on a substantial number of small entities. This rule directly regulates individual aliens. However, the RFA's regulatory flexibility analysis requirements apply only to small entities subject to the requirements of the rule.[17] The individual aliens subject to the requirements of this rule are not small entities as defined in 5 U.S.C. 601(6). Accordingly, DHS certifies that this rule does not have a substantial economic impact to a substantial number of small entities.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, which includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector.[18] The inflation adjusted value of $100 million in 1995 is approximately $200 million in 2023

based on the Consumer Price Index for All Urban Consumers (CPI–U).[19] This rule is exempt from the written statement requirement, because DHS did not publish a notice of proposed rulemaking for this rule. In addition, this final rule does not contain a Federal mandate as the term is defined under UMRA.[20] The requirements of title II of UMRA, therefore, do not apply; and DHS has not prepared a statement under UMRA.

## E. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

This IFR is not a "rule" as defined by the Congressional Review Act (CRA), enacted as part of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121. *See* 5 U.S.C. 804(3)(C) (defining the term "rule" to exclude "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties"). DHS will nonetheless submit this IFR to both houses of Congress and the Comptroller General before the rule takes effect.

## F. Executive Order 14192 (Unleashing Prosperity Through Deregulation)

This rule is exempt from Executive Order 14192 as it is a regulation issued with respect to national security, homeland security and the immigration-related function of the United States.

## G. Executive Order 13132 (Federalism)

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, Federalism, 64 FR 43255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the

preparation of a federalism summary impact statement.

## H. Executive Order 12988 (Civil Justice Reform)

This rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this rule meets the applicable standards provided in section 3 of E.O. 12988.

## I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This rule does not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

## J. National Environmental Policy Act

DHS and its components analyze final actions to determine whether the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq.*, applies to them and, if so, what degree of analysis is required. DHS Directive 023–01 Rev. 01 and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual)[21] establish the policies and procedures that DHS and its components use to comply with NEPA, 42 U.S.C. 4321 *et seq.*[22]

NEPA allows Federal agencies to establish categories of actions ("categorical exclusions") that experience has shown do not, individually or cumulatively, have a significant effect on the human

---

[17] Small Business Administration, A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act at 22 (Aug. 2017), *https://advocacy.sba.gov/wp-content/uploads/2019/07/How-to-Comply-with-the-RFA-WEB.pdf.*

[18] *See* 2 U.S.C. 1532(a).

[19] *See* BLS, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202406.pdf* (last visited Aug. 6, 2024). Calculation of inflation: (1) Calculate the average percent change in CPI–U for the reference year (1995) and the current year (2023); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2023−Average monthly CPI–U for 1995) ÷ (Average monthly CPI–U for 1995)] × 100 = [(304.702 − 152.383) ÷ 152.383] = (152.319/152.383) = 0.99958001 × 100 = 99.96 percent = 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

[20] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6).

[21] The Instruction Manual contains DHS's procedures for implementing NEPA and was issued November 6, 2014, available at *https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex.*

[22] The Council on Environmental Quality (CEQ) regulations, 40 CFR parts 1500 through 1508, also discuss NEPA implementing procedures. DHS is aware of the November 12, 2024 decision in *Marin Audubon Society v. FAA*, 121 F.4th 902 (D.C. Cir. 2024), *reh'g en banc denied*, No. 23–1067, 2025 WL 374897 (D.C. Cir. Jan. 31, 2025). To the extent that a court may conclude that the CEQ regulations implementing NEPA are not judicially enforceable or binding on this agency action, DHS notes that its NEPA procedures and approach here are fully consistent with the NEPA statute in addition to being consistent with the CEQ regulations. Even in the absence of the CEQ regulations, DHS would proceed as it has here.

environment and, therefore, do not require an environmental assessment (EA) or environmental impact statement (EIS).[23] *See* 42 U.S.C. 4336(a)(2), 4336e(1). The Instruction Manual, Appendix A lists the DHS Categorical Exclusions.[24]

Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[25]

This rule amends DHS's existing regulations at 8 CFR 264.1(a) to identify another method for aliens to apply to register and be fingerprinted under the alien registration requirements of the INA. DHS has reviewed the rule and finds that the rule is of a strictly administrative or procedural nature, and that no significant impact on the environment, or any change in environmental effect will result from the rule.

Accordingly, DHS finds that the promulgation of this final rule's amendments clearly fits within categorical exclusion A3 established in DHS's NEPA implementing procedures as an administrative change with no change in environmental effect, is not part of a larger federal action, and does not present extraordinary circumstances that create the potential for a significant environmental effect.

*K. Family Assessment*

DHS has reviewed this rule in line with the requirements of section 654 of the Treasury General Appropriations Act, 1999.[26] DHS has systematically reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and

personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this regulation will not negatively affect family well-being and will not have any impact on the autonomy and integrity of the family as an institution.

*L. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995 (PRA), 44 U.S.C. 3501 *et seq.*, DHS is required to submit to the Office of Management and Budget (OMB) for review and approval any new collections of information. This rule requires the use of Form G–325R, Biographic Information (Registration). Consistent with 5 CFR 1320.13, USCIS has submitted and OMB has approved a request for emergency authorization of the required changes for a period of 6 months, as a new collection of information.

In this final rule, USCIS is requesting comments on this information collection. Comments are due by May 12, 2025. When submitting comments on the information collection, your comments should include OMB Control Number 1615—NEW and address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, such as permitting electronic submission of responses.

A summary of the information collection follows.

USCIS Form G–325R (OMB Control Number 1615—NEW)

(1) *Type of Information Collection:* New collection.

(2) *Title of Form/Collection:* Biographic Information (Registration).

(3) *Agency form number, if any, and the applicable component of DHS*

*sponsoring the collection:* Form G–325R; USCIS.

(4) *Affected public who will be asked or required to respond:* Aliens, Individuals or Households. Aliens who are subject to alien registration requirements of the Immigration and Nationality Act, as amended, who have not yet registered.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection is 1,400,000 annually over a three-year period.[27] The estimated hour burden per response is 0.67 hours. The estimated total number of respondents for the information collection of biometrics is 1,400,000 annually over a three-year period and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The estimated total annual hour burden associated with this collection is 2,576,000 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden (*e.g.*, filing fees and postage) associated with this collection is $0

In addition, for PRA purposes, the estimated total annual opportunity cost of responding to this collection is $43,110,480 for completing the Form G–325R online and $75,282,480 for obtaining biometrics. This burden cost is prepared for PRA purposes and does not include travel time.

For further information on the approved collection of information, including the estimated burden and the expiration date, please refer to the OMB Control Number 1615—NEW at *www.reginfo.gov.*

**List of Subjects in 8 CFR Part 264**

Aliens, Reporting and recordkeeping requirements.

Accordingly, for the reasons set forth in the preamble, DHS amends 8 CFR part 264 as follows:

[23] *See also* 40 CFR 1507.3(e)(2)(ii) and 1501.4.
[24] *See* Appendix A, Table 1.
[25] *Instruction Manual 023–01* at V.B(2)(a)–(c).
[26] Public Law 105–277, 112 Stat. 2681 (1998).

[27] DHS notes that the estimate of annual filing volume in the PRA section is different from the average of the estimated population discussed in the Affected Population section above. DHS uses a different method for estimating the average annual number of respondents for the information collection over the 3-year OMB approval of the control number generally assuming more registrations may be expected to occur in year one than in later years. When the information collection request is nearing expiration USCIS will update the estimates of annual respondents based on actual results in the submission to OMB. The PRA burden estimates are generally updated at least every 3 years. Thus, the PRA estimated annual respondents would be updated to reflect the actual effects of this rule within a relatively short period after a final rule takes effect.

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 1. The authority citation for part 264 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1201, 1302–1305; 8 CFR part 2.

■ 2. Amend § 264.1 by:
■ a. In the table in paragraph (a), adding an entry, in alphabetical order, for "G–325R, Biographic Information (Registration), or its successor form"; and
■ b. In the table in paragraph (b), adding an entry, in alphabetical order, for "USCIS Proof of Alien G–325R Registration, or its successor form".
The additions read as follows:

### § 264.1   Registration and fingerprinting

(a) * * *

Form No. and Class

\*     \*     \*     \*     \*

G–325R, Biographic Information (Registration), or its successor form.

\*     \*     \*     \*     \*

(b) * * *

Form No. and Class

\*     \*     \*     \*     \*

USCIS Proof of Alien G–325R Registration, or its successor form.

\*     \*     \*     \*     \*

**Kristi Noem,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2025–03944 Filed 3–7–25; 4:35 pm]
BILLING CODE 9111–97–P

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 39

[Docket No. FAA–2024–2420; Project Identifier MCAI–2024–00143–T; Amendment 39–22978; AD 2025–05–06]

RIN 2120–AA64

### Airworthiness Directives; De Havilland Aircraft of Canada Limited (Type Certificate Previously Held by Bombardier, Inc.) Airplanes

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** The FAA is superseding Airworthiness Directive (AD) 2022–01–02, which applied to certain De Havilland Aircraft of Canada Limited Model DHC–8–400, –401, and –402 airplanes. AD 2022–01–02 required inspecting for corrosion of the nacelle to wing rear spar attachment pins, and the nacelle to landing gear attachment pins, and doing all applicable corrective actions. This AD was prompted by a determination that some operators were unable to identify the airplanes subject to each requirement. This AD continues to require the actions specified in AD 2022–01–02, clarifies the affected airplanes for each required action, and revises the applicability by removing Model DHC–8–400 airplanes; as specified in Transport Canada AD, which is incorporated by reference. The FAA is issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective April 18, 3036.

The Director of the Federal Register approved the incorporation by reference of a certain publication listed in this AD as of April 18, 3036.

**ADDRESSES:**

*AD Docket:* You may examine the AD docket at *regulations.gov* under Docket No. FAA–2024–2420; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, the mandatory continuing airworthiness information (MCAI), any comments received, and other information. The address for Docket Operations is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

*Material Incorporated by Reference:*

• For Transport Canada material identified in this AD, contact Transport Canada, Transport Canada National Aircraft Certification, 159 Cleopatra Drive, Nepean, Ontario K1A 0N5, Canada; telephone 888–663–3639; email *TC.AirworthinessDirectives-Consignesdenavigabilite.TC@tc.gc.ca.* You may find this material on the Transport Canada website at *tc.canada.ca/en/aviation.*

• You may view this material at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available at *regulations.gov* under Docket No. FAA–2024–2420.

**FOR FURTHER INFORMATION CONTACT:** Fatin Saumik, Aviation Safety Engineer, FAA, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7300; email *9-avs-nyaco-cos@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

The FAA issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 to supersede AD 2022–01–02, Amendment 39–21890 (87 FR 4145, January 27, 2022) (AD 2022–01–02). AD 2022–01–02 applied to certain De Havilland Aircraft of Canada Limited Model DHC–8–400, –401, and –402 airplanes. AD 2022–01–02 required doing a detailed visual inspection for corrosion of the nacelle to wing rear spar attachment pins, and the nacelle to landing gear attachment pins, and doing all applicable corrective actions. The FAA issued AD 2022–01–02 to address premature corrosion and subsequent failure of the nacelle to landing gear and nacelle to rear wing spar attachment pins, which, if undetected, could lead to a single or dual collapse of the main landing gear.

The NPRM published in the **Federal Register** on November 12, 2024 (89 FR 88910). The NPRM was prompted by AD CF–2020–51R2, dated February 27, 2024, issued by Transport Canada, which is the aviation authority for Canada (Transport Canada AD CF–2020–51R2) (also referred to as the MCAI). The MCAI provides clarification of the applicability for each of its parts (Parts I through V) and otherwise maintains the requirements of Transport Canada AD CF–2020–51R1. It also revises the applicability section to remove Model DHC–8–400 airplanes since no Model DHC–8–400 airplanes have been delivered.

In the NPRM, the FAA proposed to continue to require the actions specified in AD 2022–01–02, clarify the affected airplanes for each required action, and revise the applicability by removing Model DHC–8–400 airplanes, as specified in Transport Canada AD CF–2020–51R2. The NPRM also proposed to correct an error in AD 2022–01–02, which included a compliance time that incorrectly used the number of flight cycles on the airplane instead of on the pins. The FAA is issuing this AD to address premature corrosion and subsequent failure of the nacelle to landing gear and nacelle to rear wing spar attachment pins. The unsafe condition, if not addressed, could result a single or dual collapse of the main landing gear.

You may examine the MCAI in the AD docket at *regulations.gov* under Docket No. FAA–2024–2420.

### Discussion of Final Airworthiness Directive

#### Comments

The FAA received a comment from Air Line Pilots Association,